# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HARALD H. MEHNERT and )
BRIGITTE E. MEHNERT, his wife, )
       )
          Plaintiffs, )    Civil Action No. 18-593
       )    Judge Nora Barry Fischer
      vs.      )
       )
AGILENT TECHNOLOGIES, INC., *et al.*, )
       )
          Defendants.

## MEMORANDUM OPINION

### I.    Introduction

In this personal injury lawsuit, Plaintiffs Harald H. Mehnert and his wife, Brigitte E. Mehnert, claim that Mr. Mehnert developed mesothelioma as a result of his exposure to asbestos containing laboratory equipment supplied by Defendant Fisher Scientific Company L.L.C. ("Fisher") during his employment at the U.S. Geological Survey ("USGS") located within the Denver Federal Center in Denver, Colorado. Pending before the Court is Fisher's Motion for Summary Judgment. (Docket No. 214). For reasons that follow, Fisher's Motion is denied.

### II.    Background

Plaintiffs originally sued numerous defendants in the Court of Common Pleas of Allegheny County, Pennsylvania alleging that the defendants exposed Mr. Mehnert to asbestos. The case was removed to this Court on May 3, 2018. (Docket No. 1). On October 18, 2018, Plaintiffs filed an Amended Complaint asserting a negligence claim against various defendant manufacturers/suppliers of asbestos containing products. (Docket No. 121, ¶¶ 18-31). Plaintiffs allege that Mr. Mehnert contracted mesothelioma as a direct and proximate result of the inhalation

of asbestos fibers and dusts contained in the defendants' products, and Mrs. Mehnert asserts a claim for loss of consortium.[1] (Id., ¶¶ 20, 42-44). Plaintiffs have settled with, or voluntarily dismissed, all defendants from their original state court complaint, except Fisher.

Following the completion of fact discovery, Fisher filed the pending summary judgment motion, which is opposed by Plaintiffs. (Docket Nos. 214-217, 224-227, 229-231, 236). On September 23, 2019, the Court convened oral argument on Fisher's summary judgment motion. Prior to addressing that motion, the Court heard argument on Plaintiffs' motion to exclude Fisher's alleged untimely disclosed documents.[2] (Docket No. 242). After hearing each party's position on the matter, the Court ordered that Fisher produce its corporate representative, Ms. Bertie M. Werley, for a second deposition.[3] (Docket No. 243). Argument on Fisher's summary judgment motion was stayed pending further order of Court. (Id.).

On October 25, 2019, Ms. Werley's second deposition was conducted and the transcript was filed on November 8, 2019. (Docket No. 249). The Court then held oral argument on Fisher's summary judgment motion on December 19, 2019 and the transcript of that proceeding was filed on December 26, 2019. (Docket Nos. 254, 256). The parties did not file any post-argument briefing. Accordingly, the matter is now ripe for disposition.

---

1       Plaintiffs also originally asserted claims for conspiracy and negligent spoliation of evidence, which were later dismissed. (Docket No. 148).

2       Plaintiffs requested that the Court exclude from evidence Bertie M. Werley's July 10, 2019 Affidavit (the "Affidavit") and the exhibits attached thereto, prohibit Fisher from using the Affidavit to support any of its claims or defenses at trial and strike any portion of Fisher's summary judgment motion that relies on the Affidavit. (Docket No. 222). The Court denied this motion. (Docket No. 247).

3       Ms. Werley's second deposition was limited to the Affidavit and Exhibits 4 and 5 attached thereto, as well as Fisher's memorandum dated July 11, 1979 (Bates No. 00379). (Docket No. 243). Fisher ultimately agreed that it would not rely on Exhibits 4 and 5 or any paragraphs in the Affidavit that reference Exhibits 4 and 5. (See Docket No. 247 at 2).

### III.    Relevant Facts[4]

Mr. Mehnert worked for the USGS as a lab technician from 1959 until 1995.  (Deposition of Harald H. Mehnert, Vol. I, Apr. 24, 2018 ("Mehnert Dep. I") (Docket No. No. 227-1) 42:24-43:1, 45:2-45:4, 54:21-54:24).  In approximately 1964, the USGS developed an argon extraction lab, where Mr. Mehnert measured the isotopic composition of argon gas for the remaining 30 years of his career.  (Id. 65:2-65:5, 65:15-65:19, 68:7-68:8).  To do so, Mr. Mehnert extracted argon gas from samples by way of induction heating and then performed isotopic composition analysis of the argon gas using a mass spectrometer.  (Trial Preservation Deposition of Harald H. Mehnert, May 3, 2018 ("Mehnert Trial Dep.") (Docket No. 227-3) 34:17-35:6).  Mr. Mehnert built the first argon extraction line in approximately 1964 and he built a second line in the 1970s.  (Id. 34:5-34:7, 36:19-36:21; Mehnert Dep. I 87:13-87:15).  He was the only employee in the argon extraction lab, with the occasional exception of his supervisor.  (Mehnert Dep. I 75:24-76:4)

In connection with his work, Mr. Mehnert testified that he used asbestos containing laboratory equipment throughout his career, including asbestos paper tape, asbestos cloth, clamps with asbestos sleeves, asbestos gloves and asbestos boards (collectively, the "Asbestos Products"), which he ordered from both Fisher and Van Waters & Rogers ("VWR").  (Mehnert Dep. I 73:16-74:1, 80:16-80:20, 82:8-82:10, 83:15-83:16; Mehnert Trial Dep. 37:19-38:12, 38:21-39:4, 39:21-41:22, 57:3-57:18).  Mr. Mehnert explained that only Fisher and VWR catalogs were available to him at work and he only ordered from them.  (Mehnert Dep. I 119:20-120:8, 183:13-183:16; Mehnert Trial Dep. 38:9-38:12).  He recalled seeing the Fisher and VWR catalogs in Building 21[5]

---

4       The factual background is derived from the undisputed evidence of record, and the disputed evidence is viewed in the light most favorable to the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

5       Throughout his career, Mr. Mehnert worked in Buildings 21 and 25 at the Denver Federal Center.  (Mehnert Dep I 53:12-53:17).  Mr. Mehnert believes that he was exposed to asbestos-containing products while working in his laboratory in Building 21.  (Id. 126:15-126:19).

beginning in the mid-1960s and throughout his career.[6]  (Id. 184:25-185:19).  Mr. Mehnert

reviewed the catalogs of either Fisher or VWR and ordered the Asbestos Products himself[7] or had

a secretary order for him.  (Mehnert Dep. I 69:5-69:15, 74:12-74:24).  Mr. Mehnert ordered from

both companies' catalogs, but he could not specify which one at any particular time, nor could he

specify what percentage of the Asbestos Products he ordered from either Fisher or VWR.  (Id.

190:1-190:3; Mehnert Trial Dep. 42:2-42:4).  Mr. Mehnert did not pay attention from whom he

ordered since both Fisher and VWR carried the same products and he considered the products to

be interchangeable.  (Mehnert Dep. I 192:15-192:17, 193:13-193:18).  He ordered and used the

Asbestos Products from Fisher and VWR from approximately 1964 until 1988.  (Id. 74:2-74:8,

159:15-160:6).

Other USGS employees testified about the laboratory products that were available at the

USGS during Mr. Mehnert's employment there.  Dr. Lawrence Snee testified that he knew Mr.

Mehnert when they worked together at the USGS from 1986 to 1995, and he was Mr. Mehnert's

supervisor from 1993 to 1995.  (Docket No. 227-14 at 10:20-11:2, 27:15-27:18).  Dr. Snee

explained that the USGS primarily used Fisher and VWR as suppliers and he recalled seeing boxes

of supplies from both companies.  (Id. 60:10-60:13, 63:9-63:13).  Fisher and VWR supplied many

of the materials that Dr. Snee used in the laboratory, including asbestos materials, and he could

not remember a time during his employment at the USGS when he was unable to order asbestos

tape from Fisher and VWR.  (Id. 57:1-57:7, 61:1-61:7).  However, Dr. Snee did not know which

company supplied the laboratory products at the USGS prior to his employment there, he did not

---

6        Mr. Mehnert described Fisher's catalog as 50 to 100 pages in thickness.  (Mehnert Dep. I 186:10-186:12).

7        Mr. Mehnert testified that he dialed a telephone number with a 303-area code when he placed an order with
Fisher over the telephone.  (Deposition of Harald H. Mehnert, Vol. II, Apr. 25, 2018 ("Mehnert Dep. II") (Docket
No. 227-2) 228:5-228:16).

know the specific laboratory products that Mr. Mehnert used prior to 1986, and Mr. Mehnert worked alone and ordered his own supplies during the time Dr. Snee worked at the USGS. (Docket No. 217-13 at 81:16-81:21, 83:20-83:24; Docket No. 227-14 at 58:11-58:14, 61:9-69:10). Dr. Carl Hedge, who worked at the USGS from 1964 until 1995, and led Mr. Mehnert's isotope geology division beginning in 1987, and Dr. Gary P. Landis, who worked at the USGS in the same building as Mr. Mehnert at times from 1974 until the mid-1990s, did not know whether Mr. Mehnert obtained or used any laboratory products manufactured or supplied by Fisher. (Docket No. 217-14 at 16:25-17:3, 102:18-102:20; Docket No. 217-15 at 19:21-20:4, 22:19-23:5, 38:18-38:22).

Sales representatives of Fisher and VWR also testified about laboratory products that were sold to the USGS. Ronald Breidenthal submitted a Declaration indicating that he was a VWR sales representative responsible for sales to the USGS from 1978 to 1983. (Docket No. 217-17, ¶ 3). According Mr. Breidenthal, VWR was the primary supplier of laboratory products and equipment to the USGS during his employment with VWR, and the USGS account was his biggest sales account throughout that time. (Id. ¶ 4). Mr. Breidenthal made weekly sales visits to the USGS and distributed copies of VWR's catalogs throughout the facility, including in Buildings 21 and 25. (Id.). Mr. Breidenthal did not recall seeing any Fisher catalogs, laboratory products or product packaging in Buildings 21 and 25, nor did he recall seeing any Fisher sales representatives present at the USGS during his tenure with VWR. (Id. ¶ 7). Mr. Breidenthal declared that he had no knowledge or information that Fisher ever sold commodity laboratory products or equipment to the USGS. (Id. ¶ 8). Melvin Scott Wallace first worked as a sales representative for VWR and then as an outside sales representative for Fisher from 1977 until 1986. (Docket No. 217-18 at 24:16-24:18, 25:2-25:8). According to Mr. Wallace, VWR was the preferred vendor over Fisher with respect to commodity laboratory products at the USGS and VWR remained the predominant

supplier of such products to the USGS during his career with Fisher. (Id. 46:23-47:13, 57:14-58:3). Cheryl Lynn Bodnar worked as a sales representative for VWR from 1981 to 2011 and has been employed as a representative at Fisher since 2012. (Docket No. 217-16 at 8:2-8:16). Ms. Bodnar recalled meeting with Mr. Mehnert at the USGS in the early 1980s and giving him and others in his building a copy of VWR's catalog. (Id. 54:3-54:11). According to Ms. Bodnar, VWR was established as the primary supplier of laboratory products to the USGS when she began working for VWR in 1981 and remained so throughout her employment with VWR. (Id. 47:9-47:13, 54:18-54:24).

As stated, Mr. Mehnert testified that he ordered and used the following Asbestos Products from Fisher and VWR from approximately 1964 until 1988:

- **Asbestos gloves**: Mr. Mehnert testified that he ordered and used five finger, gray, heavy-duty asbestos containing gloves. (Mehnert Dep. I 76:12-76:18, 77:12-77:19; Mehnert Trial Dep. 47:15-47:18). He ordered the asbestos gloves throughout his career and he used them almost daily when he did argon extraction because the gloves were heat resistant and he was working with temperatures up to 800 degrees. (Mehnert Dep. I 76:19-77:5, 77:20-77:23; Mehnert Dep. II 267:19-267:22). Over time, the asbestos gloves deteriorated to some extent and Mr. Mehnert ordered new gloves. (Mehnert Trial Dep. 47:22-48:17). Mr. Mehnert did not know who manufactured the asbestos gloves, but "[t]he supplier was Van Waters & Rogers. … [and] could have been also Fisher Scientific." (Mehnert Dep. I 78:3-78:10). Mr. Mehnert subsequently reiterated that he ordered asbestos gloves from both Fisher and VWR, but he did not know one way or the other which company supplied the gloves that he used and to say that Fisher supplied them would be speculation.

(Mehnert Dep. II 261:10-261:19; Mehnert Trial Dep. 38:24-39:4, 48:22-49:1).

- **Asbestos paper tape**:[8]  Mr. Mehnert used asbestos paper tape when he manufactured "heating fingers," which involved wrapping a metal sleeve and wire around a glass tube, placing three or four layers of the asbestos paper tape around it and wetting it down so that it would stick together.  (Mehnert Dep. I 79:18-80:12, 179:17-179:24; Mehnert Trial Dep. 45:1-45:8).  Mr. Mehnert cut and applied the asbestos paper tape in this fashion at least once or twice a week throughout his career, and he estimated that he used a roll of it every two months.  (Mehnert Dep. I 179:8-179:16, 180:4-180:8; Mehnert Trial Dep. 45:13-45:20, 46:19-46:21).  Mr. Mehnert testified that the asbestos paper tape came on a roll and he cut off the length he needed with scissors, which resulted in dust on his fingers.  (Mehnert Dep. I 172:5-172:16; Mehnert Trial Dep. 46:6-46:7).  The asbestos paper tape was grayish in color, thicker than normal paper,  approximately 2-4 inches wide,[9] a new roll was five or six inches in diameter, and it had a cardboard core, some of which were marked with Fisher Scientific.  (Mehnert Dep. I 172:17-173:5, 173:15-176:12; Mehnert Trial Dep. 44:1-44:2).  Mr. Mehnert did not know who manufactured the asbestos paper tape, but the supplier was VWR and Fisher.  (Mehnert Dep. I 78:21-79:3).  The asbestos paper tape offered by Fisher and VWR were interchangeable,

---

[8]    Mr. Mehnert referred to this product as asbestos paper at times in his deposition testimony; however, he clarified that it was asbestos paper tape.  Compare Mehnert Dep. II 258:20-258:24 (in response to inquiry whether he used any asbestos-containing tape during his time at the USGS, Mr. Mehnert stated, "No tape – no asbestos tape, just the paper.") with Mehnert Trial Dep. 70:1-70:15, 73:14-74:9 (Mr. Mehnert identified asbestos paper tape in Fisher's 1965 catalog and confirmed that it was something he ordered in his lab).  The parties agree that Mr. Mehnert's reference to asbestos paper was asbestos paper tape.  See Docket No. 230 at 4, ¶ 5.

[9]    Mr. Mehnert testified that he "[didn't] know exactly" the width of the paper tape, but approximated that it was two or three inches wide, (Mehnert Trial Dep. 44:1-44:2), or three to four inches wide.  (Mehnert Dep. I 172:17-172:22).

and Mr. Mehnert did not prefer one company's asbestos paper tape over the other. (Id. 193:8-193:18). When Mr. Mehnert retired, he brought home one roll of already used asbestos paper tape which was the same as described above. (Mehnert Dep. II 234:7-235:8). He did not know which company manufactured or supplied that roll of asbestos paper tape. (Id. 235:10-235:13). Mr. Mehnert was going to use the asbestos paper tape for glass blowing projects, but never ending up doing so, and it remained in his storage shed since he brought it home. (Id. 236:22-237:9; 239:16-239:24).

- **Asbestos board**:[10] Mr. Mehnert used an asbestos board on the argon extraction table because of the extreme heat that was involved in his work. (Mehnert Dep. I 81:5-81:10). The asbestos board was about four feet by five or six feet, a quarter to half an inch thick and dark gray or almost black in color. (Mehnert Dep. II 270:24-271:3, 271:17-271:19; Mehnert Trial Dep. 50:23). Mr. Mehnert installed one asbestos board on an extraction line that was built in the 1960s and he installed another asbestos board on a second extraction line that was built in the 1970s. (Id. 273:2-273:14, 277:6-277:7). To install the asbestos board each time, Mr. Mehnert

---

[10] As discussed below, Fisher claims that it did not sell the Asbestos Products, including the transite boards that Mr. Mehnert testified he used. (Docket No. 215 at 6, 14-15). According to Fisher, "Mr. Mehnert in error synonymously referred to the transite boards as 'asbestos boards.' These are different products, but the distinction does not save Plaintiffs' claims." (Id. at 6, n.3). To be clear, when Mr. Mehnert initially was asked to identify the asbestos-containing products he ordered, he specified "asbestos boards" among others and explained that he used an asbestos board on each argon extraction table. (Mehnert Dep. I 73:12-73:17, 80:21-81:14). In response to defense counsel's question about where transite was used, Mr. Mehnert replied that is was used on the extraction line table and indicated those were the boards he talked about earlier. (Id. 147:24-148:4). Defense counsel later questioned Mr. Mehnert about his use of transite or asbestos boards, and Mr. Mehnert explained that he saw the boards in Fisher's catalog somewhere in the late 1960s described as "transite or asbestos board. I do not recall." (Mehnert Dep. II 270:3-270:22). Mr. Mehnert subsequently referred to the boards in question as asbestos. (Mehnert Trial Dep. 50:21-51:5). After reviewing Mr. Mehnert's testimony, the Court concludes that Mr. Mehnert initially referred to the boards as asbestos, mentioned transite after defense counsel used that word and overall used asbestos and transite interchangeably throughout his deposition testimony when discussing the boards. As such, the Court concludes that Mr. Mehnert's overall testimony encompassed his use of asbestos boards.

cut it to the correct dimension, drilled a few holes into it, which created dust that he could see, and screwed it on to a wooden table. (Mehnert Dep. I 81:10-81:14, 87:21-88:2; Mehnert Dep. II 273:15-273:22, 275:13-276:5, 277:8-277:14; Mehnert Trial Dep. 50:24-51:14). For each asbestos board that was installed, Mr. Mehnert occasionally cut other holes in it for the extraction line. (Mehnert Dep. II 275:16-275:19, 276:11-276:13, 277:18-277:21). He testified that he saw the asbestos board in Fisher's catalog in approximately the late 1960s. (Id. 270:3-270:15). Mr. Mehnert did not know who manufactured the asbestos boards that he used, but one board was supplied by Fisher and one was supplied by VWR, although he could not tell which one was which. (Mehnert Dep. I 80:23-81:4; Mehnert Dep. II 271:8-271:16).

- **Clamps with asbestos sleeves**: Throughout his career, Mr. Mehnert used metal clamps that had two fingers on one side and one finger on the other to hold sample bottles in place. (Mehnert Dep. I 82:6-82:10; Mehnert Dep. II 286:16-286:18, 288:16-288:18; Mehnert Trial Dep. 49:5-49:18). The clamp's fingers were covered with asbestos sleeves. (Mehnert Dep. II 286:19-286:21; Mehnert Trial Dep.49:19-50:3). Mr. Mehnert had three or four such clamps in his laboratory which he used on both extraction lines. (Mehnert Dep. II 282:12-282:19). He ordered the clamps when the first extraction line was built in the 1960s and he ordered more when the second line was built in the 1970s. (Id. 284:4-284:15). He had to replace the asbestos sleeves once or twice because they wore down and became frail, and the replacement sleeves were supplied by either Fisher or VWR. (Id. 286:22-287:6; Mehnert Trial Dep. 50:4-50:14). The clamps did not have any logo or marking on

them to identify the manufacturer or supplier, but he ordered them from either VWR or Fisher catalogs and either VWR or Fisher supplied the clamps that he used. (Mehnert Dep. I 81:17-81:25; Mehnert Dep. II 281:23-282:1, 284:20-285:2, 285:8-286:4). Mr. Mehnert could not specify if Fisher supplied one or all the clamps he used in his laboratory. (Mehnert Dep. II 285:12-285:15).

- **Asbestos cloth**: Mr. Mehnert used asbestos cloth, which he described as a heavy-duty grayish cloth in the size of about a four or five-inch square.[11] (Mehnert Dep. I 82:11-82:19; Mehnert Dep. II 290:10, 290:15-290:17, 291:15-291:17, 292:2-292:3). Mr. Mehnert cut the cloth and wrapped it around a titanium furnace that was attached to the extraction line. (Mehnert Dep. II 290:10-290:14, 291:18-291:22). He had to do this work every two weeks. (Id. 291:23-292:1). Mr. Mehnert specifically recalled seeing the asbestos cloth in Fisher's catalog; however, as with the other products, he ordered from both Fisher and VWR and it was supplied by either company. (Mehnert Dep. I 82:20-83:2; Mehnert Dep. II 290:21-290:24, 292:16-293:4).

As stated, Mr. Mehnert testified that he ordered and used the Asbestos Products from Fisher and VWR from about 1964 until 1988. (Mehnert Dep. I 74:2-74:8, 159:15-160:6). To that end, Mr. Mehnert identified a photocopy of excerpts from Fisher's 1965 catalog and confirmed that it was substantially similar to a catalog he used in that same time period. (Mehnert Trial Dep. 70:3-71:2). Mr. Mehnert reviewed the excerpts of Fisher's 1965 catalog and identified asbestos board, asbestos paper tape,[12] asbestos cloth and asbestos gloves as products he ordered from Fisher. (Id.

---

11    In response to defense counsel's inquiry whether the asbestos cloth came in precut sheets of that size, Mr. Mehnert stated, "I think that's the way it came." (Mehnert Dep. II 290:15-290:17).

12    When identifying the asbestos-containing products that he used from Fisher's catalog, Mr. Mehnert read the

71:10-71:16, 74:1-74:9, 74:18, 75:14-75:16, 76:10-76:12). Mr. Mehnert also identified a photocopy of excerpts from VWR's 1972 catalog and verified that it was substantially similar to a catalog he used at that time. (Id. 53:5-54:9, 55:23-56:4). He identified asbestos board, asbestos cloth, asbestos paper tape, clamps with asbestos sleeves, replacement asbestos sleeves and asbestos gloves as products he ordered from VWR. (Id. 55:7-55:15, 56:19, 57:3, 57:8, 57:17-57:18, 58:18-59:3, 59:15-59:17, 61:20-61:24, 64:11-64:14, 65:2-65:3, 65:21-65:22, 66:6-67:7, 67:18-67:21).

Fisher's corporate representative, Ms. Werley, was deposed twice in this case. See Deposition of Bertie Werley, Dec. 14, 2018 ("Werley Dep. I") (Docket No. 245-1); Deposition of Bertie Werley, Oct. 25, 2019 ("Werley Dep. II") (Docket No. 249). To prepare for her deposition, Ms. Werley reviewed the transcripts of depositions of Jack Reilly and Bob Forte, who was Fisher's previous corporate representative, as well as the affidavit of Cheryl Bodnar, and she spoke with Mr. Forte in September 2018. (Werley Dep. I 17:6-17:19). Ms. Werley also executed an Affidavit in which she attested that she had personal knowledge of the facts therein and was familiar with the products Fisher offered for sale by virtue of her employment with the company and her review of its historical documents and catalogs. (Affidavit of Bertie M. Werley ("Werley Aff.") (Docket No. 217-7) ¶¶ 1, 2). Ms. Werley testified that her institutional knowledge was also based on review with Mr. Forte. (Werley Dep. II 250:1-250:3). According to Ms. Werley's Affidavit and testimony:

- Fisher's record retention policy is ten years for customer summaries, which includes total customer sales, and seven years for individual invoices. (Werley Dep. I 44:3-44:5, 46:12-46:13). Given its record retention policy, Fisher does not have any sales records to the USGS prior to 2011. (Id. 48:3-48:14). As such, Fisher

---

description of asbestos cloth tape and stated that he did not use that product. (Mehnert Trial Dep. 75:3-75:11).

does not have any records of any sales of asbestos-containing products to the USGS in the 1960s through the 1990s. (Id. 56:11-56:23; Werley Aff. ¶ 4). To be clear, based on its record retention policy, Fisher does not have sales records to any entity between 1964 and 1995, and thus does not know to whom it sold asbestos-containing products. (Werley Dep. II 283:21-283:25, 284:13-284:19, 295:5-295:12).

- Fisher never offered for sale, sold or supplied the asbestos paper tape described by Mr. Mehnert. (Werley Aff. ¶ 5). Ms. Werley testified that asbestos paper tape last appeared for sale in Fisher's 1972 catalog, but Fisher does not have sales records for when it last sold this product or any asbestos tapes regardless of product name or size. (Werley Dep. I 97:8-97:11; Werley Dep. II 343:3-343:8, 343:17-343:19). Nonetheless, Ms. Werley attested in her Affidavit that Fisher last offered for sale asbestos paper tape in its 1970 catalog and the only asbestos paper tape that Fisher offered for sale, sold or supplied from at least 1959 until it ceased selling it was ½-inch or 1-inch wide. (Werley Aff. ¶ 6). Fisher offered for sale asbestos cloth tape in 2-inch size. (Werley Dep. II. 303:11, 304:11-304:20). Fisher never offered for sale, sold or supplied asbestos paper tape that had "Fisher" or "Fisher Scientific" printed or stamped on any portion of the product, including any cardboard core. (Werley Dep. II 325:18-326:2, 328:19-328:21, 359:11-359:16; Werley Aff. ¶ 7). Ms. Werley knew this only from her conversation with Mr. Forte. (Werley Dep. II 359:11-359:23). Ms. Werley visually inspected and measured the roll of asbestos paper tape that Mr. Mehnert testified he used and took from the USGS and it measured 2 inches wide. (Werley Aff. ¶ 8). There were no markings on Mr.

Mehnert's roll of asbestos paper tape and it did not have a core. (Werley Dep. II 401:18-401:23).

- Fisher never offered for sale, sold or supplied the "transite" board or asbestos board described by Mr. Mehnert. (Werley Aff. ¶ 11). Fisher last offered for sale transite boards that were 36 inches by 48 inches in its 1926 catalog, but Ms. Werley did not know when Fisher last sold a transite board based on its record retention policy. (Id.; Werley Dep. II 406:12-406:17). Ms. Werley did not recall the last time asbestos boards appeared in Fisher's catalog; however, after reviewing various Fisher catalogs, she acknowledged that asbestos boards of 42 inches by 48 inches in dimension appeared in the catalogs from the 1960s and up until 1970. (Werley Dep. II 406:8-406:11, 415:9-415:15). Ms. Werley did not know when Fisher last sold an asbestos board based on its record retention policy. (Id. 406:18-406:20).

- Fisher never offered for sale, sold or supplied the clamps with asbestos sleeves described by Mr. Mehnert. (Werley Aff. ¶ 12). Fisher manufactured the clamps that were offered for sale in its catalogs in the 1960s through 1980s, but another company manufactured the asbestos sleeves that Fisher placed on the clamps, although Ms. Werley did not know which company. (Werley Dep. I 105:11-106:24; Werley Dep. II 435:9-435:16, 435:21-435:24). Fisher stamped the word "Fisher" onto the metal portion of all clamps with asbestos sleeves that it offered for sale in its catalogs. (Werley Dep. I 186:20-186:22; Werley Dep. II 420:15-420:23; Werley Aff. ¶ 12). Ms. Werley attested in her Affidavit that Fisher last offered for sale clamps with asbestos sleeves in its 1975 catalog. (Werley Aff. ¶ 12). Fisher never offered for sale in its catalogs any asbestos-containing

replacement clamp sleeves as a stand-alone product, and it has no record that it ever offered for sale, sold or supplied any such products that were not listed in its catalogs. (Id. ¶ 13; Werley Dep. I 106:25-107:9; Werley Dep. II 426:15-42:16). Ms. Werley also testified that Fisher manufactured Castaloy clamps which were sold with asbestos sleeves, and Fisher supplied this product to VWR. (Werley Dep. I 188:6-188:8, 188:15-188:19, 189:20-190:11, 191:5-191:16, 192:17-193:9; Werley Dep. II 424:21-425:8, 427:16-427:20).

- Fisher never offered for sale, sold or supplied individual pre-cut sheets of asbestos cloth in any dimension as described by Mr. Mehnert, and it has no record that it ever offered for sale, sold or supplied any asbestos cloth that was not listed in its catalogs. (Werley Aff. ¶ 14).

- Fisher last offered for sale asbestos-containing gloves in its 1979 catalog. (Werley Dep. I 91:23-92:1; Werley Aff. ¶ 15). If Mr. Mehnert ordered any heat-resistant gloves from Fisher in 1980 or thereafter, Fisher could have supplied only non-asbestos containing heat-resistant gloves, not asbestos gloves. (Werley Aff. ¶ 15). However, Ms. Werley testified that Fisher does not have records of the last sale of asbestos gloves from its inventory. (Werley Dep. II 439:18-440:2).

- All Fisher catalogs published and issued from 1958 to at least 1995 have no fewer than 900 pages. (Werley Aff. ¶ 17). The pages were double-sided, so the catalogs consisted of no fewer than 450 sheets of paper. (Werley Dep. II 442:2-443:5).

- Fisher never listed in its catalogs any 303-area code telephone number during the period in which it offered for sale in its catalogs any of the Asbestos Products. (Werley Aff. ¶ 18). Fisher first listed a telephone number with a 303-area code in

its 1981 catalog and it did not offer for sale the Asbestos Products in its 1981 catalog. (Id.; Werley Dep. II 440:7-440:8). According to Ms. Werley, if Mr. Mehnert ordered Asbestos Products from a catalog using a telephone number with a 303-area code, then those products could not have been ordered from Fisher. (Werley Aff. ¶ 18). However, Ms. Werley acknowledged that she did not know when the telephone number with the 303-area code came into existence. (Werley Dep. II 440:9-440:15).

- After asbestos products were discontinued and no longer listed for sale in its catalogs, Fisher sold the remaining inventory of those products. (Werley Dep. I 98:1-98:11). However, given its record retention policy, Fisher does not have records when it last sold asbestos boards, asbestos gloves, asbestos paper tape, asbestos cloth or clamps with asbestos sleeves. (Id. 98:12-98:22). Ms. Werley testified that she "[could not] point to a document" indicating the last date when Fisher sold an asbestos-containing product. (Werley Dep. II 336:20-337:5). Ms. Werley was unable to testify as to when Fisher exhausted its inventory of such products and stated, "I confirm again that we do not know when the last sale of asbestos products was made based on our record retention policy." (Id. 339:8-339:13, 342:20-343:1; 447:2-447:4).

Certain Fisher internal memoranda indicate that Fisher sold its remaining inventory of asbestos-containing products but it was unclear when the last sale of such products occurred. A memorandum dated July 11, 1979 stated, "[i]t was agreed that all asbestos products from outside suppliers will be discontinued in domestic branches effective September 1, 1979. . . . We will, however, sell-off existing inventory." (Docket No. 227-10 at 39). A memorandum dated August

8, 1980 summarizing branch activity on asbestos-related items shows that the sale of asbestos products continued and 483 pairs of asbestos gloves had been sold as of August 1, 1980. (Docket No. 227-10 at 40). A handwritten note on the August 8th memorandum states, "[A]re these sales from existing stock? Are we reordering these items? What is current stock on these items? Check new catalog? Are these items discontinued?" (Id.). Another memorandum on September 2, 1980 noted the decision of "sometime ago" to discontinue asbestos products but stated that "there continues to be customer demand, although considerably less." (Docket No. 227-10 at 41). As such, Fisher "[had] been buying for the back-orders which result." (Id.). The memorandum further specified that Fisher would stop ordering from vendors "effective immediately," but would do its best to satisfy backorders though "eventually" it would have to advise cancellation of the backorder. (Id.). Asbestos gloves were listed as one of the involved items. (Id.). Finally, a memorandum dated September 9, 1980 confirmed that Fisher still had asbestos gloves in its inventory at that time. (Docket No. 227-10 at 42).

As noted, after a career that spanned several decades, Mr. Mehnert retired from the USGS in 1995. (Mehnert Dep. I 45:2-45:4). On September 11, 2017, Mr. Mehnert was diagnosed with mesothelioma, which is an asbestos-related cancer. (Id. 116:20-116:24).

IV.    **Standard of Review**

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact is one that could affect the outcome of litigation. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015) (citing Anderson, 477 U.S. at 248). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

<u>N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue</u>, 665 F.3d 464, 475 (3d Cir. 2011) (quoting <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. <u>Hugh v. Butler Cnty. Family YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. <u>Santini v. Fuentes</u>, 795 F.3d 410, 416 (3d Cir. 2015) (citing <u>Matsushita</u>, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. <u>Id.</u> (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. <u>Bialko v. Quaker Oats Co.</u>, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing <u>Valhal Corp. v. Sullivan Assocs. Inc.</u>, 44 F.3d 195, 200 (3d Cir. 1995)).

The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. <u>Guidotti v. Legal Helpers Debt Resolution, L.L.C.</u>, 716 F.3d 764, 772 (3d Cir. 2013) (citing <u>Celotex Corp.</u>, 477 U.S. at 324). Finally, in evaluating a summary judgment motion, the district court "may not make credibility determinations or weigh the evidence." <u>Id.</u> (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)). Given these standards, summary judgment is not warranted here.

## V.    <u>Analysis</u>

Fisher contends that it is entitled to summary judgment because it did not sell or supply the Asbestos Products that Mr. Mehnert testified he used during his work at the USGS, and there is no evidence that he was exposed to asbestos from any product known to have been supplied by Fisher, much less with the requisite frequency, regularity and proximity to establish that any such

exposure was the proximate cause of his alleged injuries. (Docket Nos. 214; 215 at 6-23; 229 at 1-5). Plaintiffs counter that the issue before the Court is whether Mr. Mehnert ordered the Asbestos Products from Fisher during the relevant years it sold those products and any arguments as to causation are premature because expert discovery has yet to occur. (Docket Nos. 224 at 2, 18; 236 at 1, n.1). To that end, Plaintiffs submit that Mr. Mehnert testified extensively about the Asbestos Products he ordered from Fisher during the relevant years Fisher sold those products, as well as his use of the products and his resulting exposure to asbestos from them. (Docket Nos. 224 at 4-20; 236 at 1-4). The Court agrees with Plaintiffs that Mr. Mehnert's testimony creates a genuine issue of material fact concerning his exposure to Asbestos Products supplied by Fisher.

Initially, the Court observes that "[a]t the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury. This is a fact-intensive inquiry." Walker v. Blackmer Pump Co., 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019). This Court previously ruled that Colorado substantive law applies in this case. (Docket No. 255). As illustrated by the parties' briefing and confirmed by the Court's own research, there is a dearth of Colorado authority concerning product identification in asbestos cases.

That said, under Colorado law, a plaintiff ultimately must establish that a particular defendant's product was a substantial contributing cause of his injury. See Merkley v. Pittsburgh Corning Corp., 910 P.2d 58, 59 (Colo. App. 1995) (citing Rupert v. Clayton Brokerage Co., 737 P.2d 1106, 1112 (Colo. 1987)). In Merkley, the Colorado Court of Appeals affirmed summary judgment when the plaintiff failed to identify the particular asbestos product to which he allegedly was exposed. Merkley, 910 P.2d at 61. The Merkley plaintiff testified that he worked with the asbestos-containing insulation product in question in 1951, which was ten years before the

defendant began making it.  Id. at 59.  Additionally, the plaintiff could only testify that the defendant's product looked "familiar" and similar to one he had worked with at some point during his 30-year career and that he had been around such products "a lot."  Id. at 59-60.  All told, the plaintiff did not testify that he saw the product at the job site during the years when the defendant manufactured it, nor could he identify where or when he saw the product or the extent of his exposure to it.  Id. at 60.

Fisher urges this Court to "follow guidance" of Merkley and apply the "frequency, regularity and proximity" test for causation articulated by the United States Court of Appeals for the Fourth Circuit in Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156 (4th Cir. 1986). (Docket Nos. 215 at 20-23; 229 at 4).  Lohrmann held that the plaintiff in a personal injury asbestos case "must prove more than a casual or minimum contact with the product" containing asbestos in order to hold the manufacturer of that product liable.  Instead, the plaintiff must present "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked."  782 F.2d at 1162-63.

To be precise, Merkley cited the Lohrmann decision only once.  Specifically, after concluding that the plaintiff's testimony did not establish his exposure to the defendant's product during the relevant time period or the fact that the product caused his illness, the Merkley court cited Lohrmann with the following parenthetical explanation:

> evidence insufficient to show any contact or to raise any inference that plaintiff was ever exposed to a Celotex product; mere proof that plaintiff and a certain asbestos product were at a shipyard at the same time, without more, does not prove exposure to that product.

Merkley, 910 P.2d at 61 (citing Lohrmann, 782 F.2d 1156).  This singular parenthetical citation was the extent of Merkley's reference to Lohrmann.  Merkley did not otherwise discuss, apply or state that it adopted Lohrmann's "frequency, regularity and proximity" test.

Rather, Merkley addressed the "dispositive issue" whether the plaintiff's "deposition testimony create[d] a genuine issue of material fact as to whether he was exposed to [the defendant's] asbestos-containing products during the relevant time period."[13] Merkley, 910 P.2d at 59. As discussed, the court concluded that there was no genuine issue of material fact because the plaintiff testified that he worked with the product ten years before the defendant began making it, the product only looked "familiar," it was similar to a product he had worked with it at some point during his 30 year career and he had been around such products "a lot." Id. at 59-60.

In contrast here, Mr. Mehnert testified repeatedly that he was exposed to the Asbestos Products supplied by Fisher (and VWR) during his decades-long career working in his laboratory at the USGS. Mr. Mehnert testified extensively concerning his recollection of the characteristics of the Asbestos Products, he identified the products he purchased and used in excerpts from Fisher's 1965 catalog (and from VWR's 1972 catalog),[14] he described the manner in which he utilized the products in his laboratory, and he explained how frequently he used them throughout his career.[15] Hence, this Court concludes that Mr. Mehnert's testimony and identification of the products from Fisher's catalog raises a reasonable inference that he was exposed to Asbestos Products supplied by Fisher during the relevant period and, as such, a genuine issue of material

---

13      In specifying this as the dispositive issue, the Merkley court cited Rupert v. Clayton Brokerage Co., 737 P.2d 1106 (Colo. 1987) for the proposition that "plaintiff must establish that a particular defendant's product was a substantial contributing cause of his injury." Merkley, 910 P.2d at 59. Merkley's citation to the Colorado Supreme Court's Rupert decision strongly indicates that this is the operative standard for proximate causation in an asbestos case in Colorado.

14      See infra n. 21 and accompanying discussion in text.

15      If the Court were to rule on the issue of proximate causation, which Plaintiffs submit (and the Court agrees) is premature given that expert discovery has not yet occurred, (see Docket Nos. 224 at 2, 18; 236 at 1, n.1), Mr. Mehnert's testimony would appear to satisfy the "frequency, regularity and proximity" test for causation which Fisher argues should apply. Mr. Mehnert testified that he was exposed to the Asbestos Products supplied by Fisher, he described the means he was exposed to asbestos from his use of the products, and he explained that his exposure occurred daily (i.e., with asbestos glove) or at least weekly or bi-weekly (i.e., with asbestos paper tape and asbestos cloth) over multiple decades working in his laboratory at the USGS. See supra at 6-10.

fact exists which precludes summary judgment.[16]

Despite same, Fisher insists that it did not offer for sale or supply the Asbestos Products that Mr. Mehnert used at the USGS and, further, there is no evidence that Mr. Mehnert ever was exposed to Asbestos Products supplied by Fisher. (Docket No. 215 at 9-19). Contrary to Fisher's position, the relevant facts summarized above make abundantly clear that there are genuine factual disputes concerning these matters.

Fisher's arguments hinge on purported discrepancies in Mr. Mehnert's description of the Asbestos Products that he testified Fisher supplied and which he used in his work. In summary, Fisher claims that: (1) it never offered for sale or supplied asbestos paper tape with a width greater than one inch and the size of the tape Mr. Mehnert used at the USGS and that he has in his possession is greater than one inch. Additionally, Fisher never labeled any asbestos paper tape it offered for sale, but Mr. Mehnert testified that some rolls of the tape he used had a cardboard core with "Fisher Scientific" stamped on it; (2) it never offered for sale or supplied asbestos cloth in precut sheets in the 4 or 5-inch square size described by Mr. Mehnert; (3) it never offered for sale or supplied the unbranded clamps with asbestos sleeves described by Mr. Mehnert because Fisher only offered for sale clamps with the name "Fisher" stamped on the metal portion; (4) it did not offer for sale or sell a transite board to the USGS when Mr. Mehnert was employed there because Fisher last offered for sale transite boards in its 1926 catalog. To the extent Mr. Mehnert identified Fisher as the supplier of an asbestos board, his use of that board was *de minimis* and is insufficient to establish proximate causation; and (5) Mr. Mehnert admitted that he does not know whether

---

16       Given Defendant's repeated and extensive testimony that he purchased the Asbestos Products from both Fisher and VWR, it is unreasonable to infer that all products came from VWR and not Fisher. See <u>Hugh</u>, 418 F.3d at 267 (on a summary judgment motion, a district court must make all reasonable inferences in the non-moving party's favor.)

Fisher supplied any asbestos gloves he used.[17]  (Docket No. 215 at 10-15).

In making these arguments, Fisher relies on the testimony and Affidavit of its corporate representative, Ms. Werley.  Certain contradictions in Ms. Werley's testimony and Affidavit serve to further highlight the existence of a genuine issue of material fact concerning Mr. Mehnert's exposure to Asbestos Products supplied by Fisher.

For instance, Ms. Werley describes in her Affidavit the characteristics and features of the Asbestos Products at issue, attests when Fisher last sold the products, states that Fisher has no record that it ever offered for sale, sold or supplied Asbestos Products that were not listed in its catalogs, and maintains that Fisher did not offer for sale, sell or supply the Asbestos Products as described by Mr. Mehnert.  Despite these affirmations, Ms. Werley admitted in her deposition testimony that given its record retention policy, Fisher does not have sales records to any entity between 1964 and 1995, and thus does not know to whom it sold asbestos-containing products or when it last sold them.[18]  (Werley Dep. I 98:12-98:22; Werley Dep. II 283:21-283:25, 284:13-283:19, 295:5:295:12).

Additionally, Ms. Werley testified that Fisher sold the remaining inventory of asbestos products after they were discontinued and no longer listed for sale in its catalogs.  (Werley Dep. I

---

17      Fisher characterizes Mr. Mehnert's testimony as an admission that he does not know whether Fisher supplied any of the asbestos gloves that he used at the USGS.  (Docket Nos. 215 at 13-14; 229 at 3). To clarify, Mr. Mehnert testified that he did not know who manufactured the asbestos gloves, but "[t]he supplier was Van Waters & Rogers. … [and] could have been also Fisher Scientific."  (Mehnert Dep. I 78:3-78:10).  Mr. Mehnert subsequently reiterated that he ordered asbestos gloves from both Fisher and VWR, but he did not know one way or the other which company supplied the gloves that he used and to say that Fisher supplied them would be speculation.  (Mehnert Dep. II 261:10-261:19; Mehnert Trial Dep. 38:24-39:4, 48:22-49:1).  Given Mr. Mehnert's identification of asbestos gloves in the excerpt of Fisher's 1965 catalog as an item that he purchased from Fisher, (Mehnert Trial. Dep 70:3-71:2, 76:10-76:12), a fair reading of Mr. Mehnert's testimony is that he ordered asbestos gloves from both Fisher and VWR and he could not specify who supplied a particular pair of gloves that he used at a particular time.

18      Given this testimony by Ms. Werley concerning Fisher's record retention policy, it is disingenuous for Fisher to assert that "there are no documents that identify Fisher Scientific as a supplier of any products to the USGS during the relevant period" and that "Plaintiffs have no record that Fisher Scientific ever supplied any products or equipment (asbestos-containing or otherwise) to the USGS."  (Docket Nos. 215 at 7, n.8; 216 at 10, ¶ 78).

98:1-98:11).   Although Ms. Werley attested in her Affidavit that Fisher last offered for sale asbestos paper tape in its 1970 catalog, clamps with asbestos sleeves in its 1975 catalog and asbestos gloves in its 1979 catalog, (Werley Aff. ¶¶ 6, 12, 15), she testified that Fisher does not have records when it last sold the Asbestos Products.  (Werley Dep. I 98:12-98:22).  Ms. Werley "[could not] point to a document" indicating the last date when Fisher sold an asbestos-containing product, (Werley Dep. II 336:20-337:5), and she was unable to testify as to when Fisher exhausted its inventory of such products stating, "I confirm again that we do not know when the last sale of asbestos products was made based on our record retention policy."[19]  (Id. 339:8-339:13, 342:20-343:1; 447:2-447:4).

All told, the contradictions noted in Ms. Werley's Affidavit and deposition testimony not only elucidate a genuine issue of material fact, particularly when compared against Mr. Mehnert's testimony, but also create an issue as to her credibility which precludes summary judgment.  See In re Citx Corp., Inc., 448 F.3d 672, 679-80 (3d Cir. 2006) (citing 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738, at 334–35 (3d Ed. 1998) ("[A] witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later deposition, despite the greater reliability usually attributed to the deposition.  The court may, however, consider whether the conflict creates a credibility issue preventing summary judgment from being entered.").  The Court notes an additional complicating factor as to Ms. Werley's credibility is her admission that her institutional knowledge concerning Fisher was based, in part, on review with Fisher's prior corporate representative, Mr. Forte, who has not personally

---

19      Certain Fisher internal memoranda confirm that it sold its remaining inventory of asbestos-containing products but it was unclear when the last sale of such products occurred.  (Docket Nos. 227-10 at 39-42).  For instance, as of September 1980, Fisher still had in its inventory and continued to sell certain asbestos products, including asbestos gloves.  (Id. at 42).

appeared in this litigation. (Werley Dep. II 250:1-250:3).

In sum, despite any discrepancies in Mr. Mehnert's description of the Asbestos Products as claimed by Fisher through Ms. Werley's Affidavit or otherwise,[20] Mr. Mehnert reviewed excerpts of Fisher's 1965 catalog, confirmed that it was substantially similar to a catalog he used in that same time period and identified asbestos board, asbestos paper tape, asbestos cloth and asbestos gloves as products that he ordered from Fisher. (Mehnert Trial Dep. 70:3-71:2, 71:10-71:16, 74:1-74:9, 74:18, 75:14-75:16, 76:10-76:12). Mr. Mehnert also reviewed excerpts of VWR's 1972 catalog, verified that it was substantially similar to a catalog he used at that time and identified certain Asbestos Products he purchased from VWR, including clamps with asbestos sleeves[21] and replacement asbestos sleeves. (Id. 53:5-54:9, 55:23-56:4, 55:7-55:15, 56:19, 57:3,

---

[20]     Drs. Snee, Hedge and Landis, who were Mr. Mehnert's co-workers during various periods of his career, testified that they did not know whether Mr. Mehnert obtained or used any laboratory products manufactured or supplied by Fisher. (Docket Nos. 217-13 at 81:16-81:21, 83:20-83:24; 217-14 at 16:25-17:3, 102:18-102:20; 217-15 at 19:21-20:4, 22:19-23:5, 38:18-38:22; 227-14 at 58:11-58:14, 61:9-61:10). These co-workers simply did not know one way or the other which company supplied the products Mr. Mehnert used in his laboratory, and it is unreasonable to infer from their testimony that Mr. Mehnert only ordered and used Asbestos Products from VWR and not Fisher, or vice versa.

Likewise, the Declaration of Mr. Breidenthal and the testimony of Mr. Wallace and Ms. Bodnar, who were or are VWR and/or Fisher sales representatives, only adds to the factual dispute here. According to the Declaration and testimony of these sales representatives, VWR was the predominant supplier of laboratory products and equipment to the USGS during the 1970s and 1980s. (Docket Nos. 217-16 at 47:9-47:13, 54:18-54:24; 217-17, ¶ 4; 217-18 at 46:23-47:13, 57:14-58:3). Just because VWR was the predominant supplier at certain times according to these individuals, it is unreasonable to infer that VWR was the only supplier and that neither Fisher nor any other company supplied any laboratory products and equipment to the USGS at any time. This point is illustrated by Dr. Snee's testimony that Fisher and VWR supplied many of the materials that he used in the laboratory, including asbestos materials, and he could not remember a time during his employment at the USGS when he was unable to order asbestos tape from Fisher and VWR. (Docket No. 227-14 at 57:1-57:7, 60:10-60:13, 61:1-61:7).

Finally, Fisher's reliance upon the size of its catalogs (Mr. Mehnert described the catalogs as 50 to 100 pages in thickness whereas Ms. Werley testified that the catalogs consisted of no fewer than 450 sheets of double-sided paper), (Mehnert Dep. I 186:10-186:12; Werley Dep. II 442:2-443:5), and whether and when Mr. Mehnert dialed a 303-area code to place a telephone order with Fisher (Ms. Werley testified that Fisher first listed a telephone number with a 303-area code in its 1981 catalog, but it did not offer for sale Asbestos Products at that time; however, Ms. Werley acknowledged that she did not know when Fisher last sold Asbestos Products), (Werley Aff. ¶ 18; Werley Dep. I 98:12-98:22; Werley Dep. II 440:7-440:15), does nothing more than add another layer to the factual dispute.

[21]     Ms. Werley testified that Fisher also manufactured Castaloy clamps which were sold with asbestos sleeves, and Fisher supplied that product to VWR. (Werley Dep. I 188:6-188:8, 188:15-188:19, 189:20-190:11, 191:5-191:16, 192:17-193:9; Werley Dep. II 424:21-425:8, 427:16-427:20). This testimony along with Mr. Mehnert's identification of clamps with asbestos sleeves as an item he purchased from VWR's 1972 catalog raises an inference that the clamps were manufactured and supplied by Fisher.

57:8, 57:17-57:18, 58:18-59:3, 59:15-59:17, 61:20-61:24, 64:11-64:14, 65:2-65:3, 65:21-65:22, 66:6-67:7, 67:18-67:21).   Given Mr. Mehnert's identification of the Asbestos Products that he purchased from Fisher's catalog (and VWR's catalog, which includes the clamps with asbestos sleeves),[22] along with his testimony that he purchased the Asbestos Products from both Fisher and VWR and his description of the manner and frequency that he used the Asbestos Products,[23] a genuine issue of material fact exists as to whether Mr. Mehnert was exposed to Fisher's Asbestos Products during his decades long career working in his laboratory at the USGS.  See Merkley, 910 P.2d at 59.  As such, summary judgment is inappropriate and it is up to a jury to decide whether Mr. Mehnert's testimony concerning his exposure to Fisher's Asbestos Products is credible.  See Guidotti, 716 F.3d at 772 (citation omitted) (in evaluating a summary judgment motion, the district court "may not make credibility determinations or weigh the evidence."); see also Gomez v. Markley, 2011 WL 2580410, at *6 (W.D. Pa. June 28, 2011) (Fischer, J.) aff'd, 493 F. App'x 334 (3d Cir. 2012) ("Because it is the jury's role to determine the credibility of the witnesses and to weigh the evidence, the Court will not substitute its judgment . . . for that of the jury.") (citations omitted); McDaniel v. Kidde Residential & Commercial, 2015 WL 5972438, at *2 (W.D. Pa. Oct. 14, 2015) (Fischer, J.) (same).

---

22      See supra n. 21.

23      Mr. Mehnert testified that he cut and drilled into the asbestos boards which created dust, he wore the asbestos gloves every day throughout his career and they deteriorated over time, he cut asbestos cloth about every two weeks and he cut rolls of asbestos paper tape once or twice a week throughout his career, which created dust, and he handled the clamps with asbestos sleeves which wore down over time and needed to be replaced.  See supra at 6-10.

**VI.** **Conclusion**

  The Court concludes that a genuine issue of material fact exists in this case which precludes summary judgment.  Accordingly, Defendant's motion for summary judgment is denied.

  An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

March 27, 2020

cc/ecf: All counsel of record